UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| SANDRA P. TOBIN, ) | Civil Action No.: 1:06-cv-0492-RBH-TER |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | |
| ) | **REPORT AND RECOMMENDATION** |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| ENERGY and WACKENHUT SERVICES, ) | |
| INC., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**I.      INTRODUCTION**

In this action, Plaintiff asserts claims of illegal seizure and excessive force pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 against Defendant Wackenhut Services, Inc. (Wackenhut). Presently before the Court is Wackenhut's Motion for Summary Judgment (Document # 161). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. Because this motion is dispositive, this Report and Recommendation is entered for review by the district judge.

**II.     FACTUAL HISTORY**

At all times relevant to this action, Plaintiff worked for the Department of Energy (DOE) at its Savannah River Site (SRS) in Aiken, Barnwell, and Allendale counties in South Carolina. The SRS is owned by the DOE Savannah River Operations Office (DOE-SR). Bartholomew Dec. ¶ 3. The SRS is a large area about one third the size of Rhode Island. Id. ¶ 2. The United States has proprietary jurisdiction at the SRS which means that South Carolina state laws, including traffic laws, apply to the SRS. Id. ¶ 4.

DOE-SR contracts with Wackenhut to provide law enforcement and security services at the SRS. Underwood Dep. at 19, 24. Wackenhut police officers have statutory authority in the same manner as deputy sheriffs in towns and counties. Id. at 21. See also S.C. Code Ann. § 23-7-10. In 2004, Mack Underwood served as Chief of Law Enforcement for Wackenhut. Id. at 18.

In the summer of 2004, Underwood was made aware that Plaintiff's driver's license was suspended. There is conflicting testimony in the record regarding who alerted Underwood to this fact. Underwood testified in his deposition that he received a complaint from a DOE employee[1] that Plaintiff was driving a government vehicle on site without a driver's license. Id. at 38-42. Larry Snyder testified that someone left a newspaper article on his desk showing the criminal report for the previous week and Plaintiff's name was highlighted. Snyder Dep. at 145. The article indicated that Plaintiff had been arrested for Driving Under Suspension. Id. Snyder then took the information to Underwood and asked him to investigate. Id. This conflicting testimony, however, is inapposite to Plaintiff's claims.

After Underwood was initially made aware of the potential that Plaintiff was driving with a suspended license, he began investigating the accuracy of the information. Underwood explained that "I cannot do any enforcement activity until I either corroborate the information if the individual wants to remain anonymous or I have that individual come forward and we go to the magistrate or we sit down and use that information to further the investigation." Underwood Dep. at 43. Once Underwood located Plaintiff in a database, he requested that Ron Bartholomew, his DOE Program Manager's Supervisor, provide him with Plaintiff's date of birth. Id. at 44. Underwood then had his terminal operator access the South Carolina Department of Motor Vehicles' (SCDMV) records and thereby

---

[1] The name of this female employee is under court seal. See Order, dated May 5, 2008 (Document # 149).

determined that Plaintiff's privileges to drive a car had been suspended. Id. at 53. Underwood advised all officers to be on the lookout for a Chrysler Sebring and it's operator, Plaintiff, due to the fact that Plaintiff had no valid South Carolina driver's license. Id. at 57.

On June 23, 2004, Plaintiff's supervisor gave her a written note stating that he had been advised by Wackenhut that her driver's license was under suspension in both Georgia and South Carolina and instructing her not to drive a government vehicle until she produced proof that she possessed a valid driver's license. Plaintiff Dep. at 106-107.

That same day, June 23, 2004, Grey Gain, a Law Enforcement Officer with Wackenhut, observed a Chrysler Sebring being driven on the SRS. Gain Declaration at ¶ 3. Officer Gain had been instructed by his Lieutenant to be on the lookout for such a car because it was believed that the person driving the car was doing so under a suspended license. Id. Officer Gain then noticed that one of the brake lights was not working. Id. Officer Gain activated his blue lights and the driver pulled over and stopped. Id. When he checked the driver's license, he discovered that the driver was Rylinda Vivian Felton, not Plaintiff. Id. Felton advised that she was driving the car off-site for Plaintiff. Id. Officer Gain checked Felton's driver's license and, when it came back clear, wrote Felton a warning ticket for the inoperable brake light and released her. Id. Officer Gain estimates that the stop lasted twenty minutes. Id.

On October 21, 2004, Jason Quattlebaum, a Law Enforcement Officer for Wackenhut, observed Plaintiff get into a Chrysler Sebring in the S-Area parking lot at SRS and drive off. Quattlebaum Declaration at ¶ 3. Three weeks prior, Officer Quattlebaum had received information from his supervisor that Plaintiff might be driving on a suspended license. Id. at ¶ 4. He also observed that her vehicle had an expired dealer's tag. Id. Officer Quattlebaum initiated a traffic stop and Plaintiff produced an identification card issued by the State of Georgia. Id. Officer Quattlebaum

requested a driver's license check through Wackenhut Law Enforcement dispatch. Id. at ¶ 5. The dispatcher informed Officer Quattlebaum that Plaintiff had a valid Georgia driver's license. Id. Thus, Officer Quattlebaum ended the traffic stop and Plaintiff drove off. Id. at ¶ 6. Officer Quattlebaum avers that a review of the videotape made by the video camera in his patrol vehicle reveals that the stop lasted just under nine minutes. Id. at ¶ 12. After Plaintiff drove off, the dispatcher informed Officer Quattlebaum that Plaintiff's South Carolina license was suspended. Id. at ¶ 6. Officer Quattlebaum then obtained an arrest warrant, #H-436329, for Plaintiff for the offense of Driving Under Suspension (DUS) More than Second. Id. at ¶ 7. Plaintiff's driving record showed two previous DUS convictions. Id.

On October 25, 2004, Sharon Cormier, a Criminal Investigator with Wackenhut, accompanied her supervisor, Lieutenant Robert E. Hardt, and Patrol Officer Linda Key, to Plaintiff's office to arrest Plaintiff pursuant to the warrant obtained by Officer Quattlebaum for DUS. Cormier Declaration at ¶ b; see also Hardt Declaration and Key Declaration. These officers planned to arrest Plaintiff at her office rather than allowing her to turn herself in because Plaintiff had failed to cooperate on a prior occasion when Cormier attempted to serve some civil papers on her. Id.

When these officers arrived at Plaintiff's office, they knocked on her door and entered after having been invited in. Id. at ¶ c. Plaintiff occupied a walled office by herself. Id. The officers closed the door upon entering. Id. Cormier advised Plaintiff who they were and why they were there. Id. Plaintiff immediately made a telephone call and the officers allowed her to complete her call. Id. Plaintiff then informed the officers that she had a Georgia license and Cormier informed her that she was under suspension in the state of South Carolina and that she did not have the right to drive in South Carolina. Id. Plaintiff then attempted to reach another person on the telephone and the officers allowed her to do so. Id.

After Cormier read the arrest warrant to Plaintiff, Lt. Hardt fingerprinted her. Id. Plaintiff attempted to make several other telephone calls and the officers informed her that they needed to finish their process. Id. They also informed her that they were not taking her to jail but to appear in front of a local magistrate. Id. Officer Key read Plaintiff her Miranda rights, and then told her she was going to have to handcuff her and proceeded to do so. Id. Plaintiff complained that the handcuffs were too tight and so Cormier told Officer Key to check the tightness of the handcuffs. Id. Officer Key put her finger through the cuffs and told Cormier that she had them as loose as she could get them. Id. Lt. Hardt asked Plaintiff if she would like to wear his jacket over her shoulders and she said yes. Id.

Officer Key escorted Plaintiff to her patrol car and put her in the front seat. Id. Lt. Hardt and Cormier drove a separate vehicle and Officer Key followed in her patrol car. Id. They proceeded to the magistrate judge's office and found it to be closed. Id. They then traveled to the office of the next closest magistrate judge and asked if her would preside over a bond hearing. Id. Cormier recommended to the Judge that Plaintiff be allowed to sign a personal recognizance bond. Id. When the proceeding was concluded, the officers left Plaintiff there with the understanding that she was calling someone to come and get her. Id. They advised her that her SRS badge would be returned to the Badge Office, which is standard procedure. Id.

Cormier avers that, with the exception of her complaint about the handcuffs, Plaintiff never made any complaints of physical discomfort or requested medical assistance. Id. at ¶ d. She further avers that no excessive force was utilized in taking Plaintiff into custody and Plaintiff was not injured by them in any fashion. Id. Lt. Hardt and Officer Key provide the same averments. Hardt Declaration at ¶ d; Key Declaration at ¶ d. Plaintiff, on the other hand, testifies that she suffered a torn ligament in her shoulder during the course of her arrest. Plaintiff Dep. at 162-163. After her arrest,

Plaintiff returned to work that same day. Id. at 165. Plaintiff avers that she sought emergency medical treatment for a torn ligament in her shoulder and bruises on her wrists as a result of the injuries she suffered during her arrest. Id.; Plaintiff Aff. at ¶ 30. She further avers that she required medical treatment for several weeks after the arrest and she suffered substantial physical and emotional injuries as a result of the force used by Wackenhut officials during her arrest. Plaintiff Aff. at ¶¶ 32-34.

### III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves).  To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Id. at 322.  See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

### IV. DISCUSSION

#### A. Section 1983 claims

Plaintiff complains that Wackenhut illegally seized her vehicle during the traffic stops on June 23, 2004 and October 21, 2004, and that it used excessive force during her arrest on October 25, 2004. Her complaint is filed pursuant to 42 U.S.C. § 1983, which "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), quoting Baker v. McCollan, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). A legal action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). To be successful on a claim under § 1983, a plaintiff must establish two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged

violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

It is important to first determine whether Wackenhut officials were acting under color of state law during the traffic stops of Plaintiff's vehicle and her subsequent arrest.  Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes "state action." See, e.g., Blum v. Yaretsky, 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). To qualify as state action[2], the conduct in question "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and "the party charged with the [conduct] must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) ("Careful adherence to the 'state action' requirement ... also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."); see U.S. v. Int 'l Brotherhood of Teamsters, Chauffeurs, Warehousemen Helpers of Am., AFL-CIO, 941 F.2d 1292 (2d Cir.1991).

Wackenhut asserts that it was not acting under color of state law because it provides services to the DOE-SR under a federal contract with the DOE.  However, the authority of its officers to conduct traffic stops and arrest individuals comes not from its contract with the DOE, but from state statute.  According to Ron Bartholomew, Wackenhut law enforcement officers are commissioned as special state constables under South Carolina law and have the same law enforcement authority as deputy sheriffs. Bartholomew Dec. ¶ 8. Furthermore, Underwood characterizes Wackenhut officials

---

[2]Sections 1983, 1985, and 1988 all require state action. See, e.g., Eisentein v. Whitman, 4 Fed.Appx. 24, 25 (2d Cir. Feb. 14, 2001)

as police officers and explains that, "[t]hey have statutory authority. They are required to be graduates of the South Carolina Criminal Justice Academy, and they have the same authority as policemen and deputy sheriffs in towns and counties." Underwood Dep. at 21. In its memorandum in support of its Motion for Summary Judgment, Wackenhut cites to S.C. Code Ann. § 23-7-10, which provides,

> The Governor may appoint and commission as special State constables such persons, including employees of a contractor of the United States Atomic Energy Commission (in this chapter hereinafter called "the Commission"), as shall be recommended to him in writing by a duly authorized representative of the Commission. Such special State constables shall serve without compensation from the State or any of its political subdivisions.

S.C. Code Ann. § 23-7-10.

This court addressed a similar issue in Thompson v. McCoy, 425 F.Supp. 407 (D.S.C. 1976). In Thompson, the plaintiff brought a § 1983 suit against a store security guard and the store for which the security guard worked. The defendants moved for dismissal, arguing that they were not acting under color of state law. The court stated,

> In order to determine whether the actions taken by the defendants were "under color of state law", with regards to § 1983, the court must look to the source of the power or authority which was supposedly abused and find if such power or authority existed by virtue of a grant from the State. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."

Thompson, 425 F.Supp. at 409 (citing United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)).

The defendant security guard in Thompson was licensed under the South Carolina Private Detective and Private Security Agency's Act.[3] Although the statute at issue in this case is different, the general principles are the same. The "source of power" allegedly abused in both cases exists by

---

[3] Then codified at S.C. Code Ann. § 56-646.1, et seq. (Cum.Supp. 1975).

virtue of a grant from the state. The court in Thompson noted, "[t]he most important feature of the [Private Detective and Private Security Agency's Act] as it relates to state action, is § 56-646.13, which clothes state-approved private security guards with 'the authority and power which sheriffs have to make arrests of any persons violating or charged with violating any of the criminal statutes of this state,' while on the employer's premises. Likewise, "a special State constable possesses all of the rights and powers prescribed by law for magistrates' constables and deputy sheriffs and powers usually exercised by marshals and policemen of towns and cities." S.C. Code Ann. § 23-7-50.

> The Thompson court further noted that it saw
>
> no practical or substantial legal distinction between this case where a store detective is legally entitled to make an arrest under a state statute specifically implemented for this purpose which implicitly clothes the defendant with such right, and in so doing, violates the accused's constitutional rights, and a situation where a police officer in making an arrest by virtue of his authority impinges upon the same rights.

Thompson, 425 F.Supp. at 410. The court finds likewise here. Wackenhut officials were enforcing state laws by virtue of state statutory authority during their interactions with Plaintiff. Thus, during the two traffic stops and Plaintiff's subsequent arrest, the Wackenhut law enforcement officers were acting under color of state law.

However, Plaintiff has not named any of the individual officers as Defendants in this action. It is well-settled that the doctrine of respondeat superior generally is inapplicable to section 1983 suits. See Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[4] In the present case, Wackenhut law enforcement officers stopped Plaintiff's vehicle on

---

[4]In Rodriguez v. Smithfield Packing Co., Inc., 338 F.3d 348(4th Cir. 2003), the court noted, "[T]he principles of § 1983 municipal liability ... apply equally to a private corporation that employs special police officers." [] This means that "a private corporation is not liable under § 1983 for torts committed by special police officers when such liability is predicated solely upon a theory of respondeat superior." [] Rather, private corporations can only be held liable under § 1983 if "an official

June 23, 2004, and October 21, 2004, and arrested her on October 24, 2004. To prevail against Wackenhut under 42 U.S.C. § 1983 for violation of her constitutional rights, Plaintiff must prove more than the fact that Wackenhut employed those responsible for Plaintiff's alleged constitutional violations, because a section 1983 claim against an employer cannot succeed under the doctrine of respondeat superior. Monell, 436 U.S. at 690 ("The action that is alleged to be unconstitutional [must] implement[ ] or execute[ ] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the company's] officers."). Instead, an employer may be liable when the "execution of the [company's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Jordan by Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir.1994) (quoting Monell, 436 U.S. at 694). Therefore, Plaintiff must present evidence of an official policy or custom that is fairly attributable to Wackenhut and that proximately caused the alleged deprivation of her constitutional rights. Id. Thus, the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Collins v. City of Harker Heights, 503 U.S. 115, 123, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1991) (quoting Springfield v. Kibbe, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987)). Section 1983 liability will not be found to exist against a company based on vicarious liability. Zepp v. Rehrman, 79 F.3d 381, 385 (4th Cir.1996). Municipal liability depends on whether the liability asserted is based on a

---

policy or custom of the corporation causes the alleged deprivation of federal rights."
[] While "'official policy' often refers to formal rules or understandings," corporate liability may also "be imposed for a single decision by [corporate] policymakers under appropriate circumstances."

Rodriguez, 338 F.3d at 355 (citing Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir.1999); Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)) (internal citations omitted). Municipalities and other local governing bodies are included among those "persons" who may be sued under § 1983. Monell, 436 U.S. at 690-91.

municipal act and not simply on the independent act of a municipal employee, even though that employee may be acting as the final decisionmaker. Greensboro Professional Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 964-65 (4th Cir. 1995). (emphasis added).

In the present case, Plaintiff asserts that "Underwood was delegated final policymaking authority to instruct Wackenhut Service, Inc. law enforcement officers to make searches and seizures." Plaintiff's Response in Opp. to Wackenhut's Motion for Summary Judgment (Document # 172) p. 15.

Plaintiff cites to Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) in support of her argument that Wackenhut should be liable for the alleged illegal seizures when her car was stopped on two separate occasions. In Pembaur, the County prosecutor instructed deputy sheriffs to "go in and get" two employees of a medical clinic for the purpose of serving capiases[5] for their detention. The physician proprietor of the clinic refused to allow the deputy sheriffs to enter the clinic and the deputy sheriffs obtained an axe and chopped down the door. However, they were unable to locate the employees named in the capiases. The physician proprietor brought a § 1983 action against the county. The Supreme Court recognized that, under appropriate circumstances, a municipality may incur § 1983 liability for a single decision of a policymaking official. Id. at 480. The Supreme Court found that the county could be liable for the actions of the deputy sheriffs because the decisionmaker, the county prosecutor, possessed final authority to establish municipal policy with respect to the action ordered. Id. at 481.

In the present case, Underwood was the Chief of Law Enforcement for Wackenhut. Once he

---

[5]"A capias is a writ of attachment commanding a county official to bring a subpoenaed witness who has failed to appear before the court to testify and to answer for civil contempt." Pembaur, 475 U.S. at 472 n.1 (citing Ohio Rev.Code Ann. § 2317.21 (1981)).

became aware that Plaintiff's license was suspended, he told his officers to be on the look out for Plaintiff and her vehicle. Underwood Dep. at 57. An issue of fact exists as to whether Underwood possessed the requisite authority to establish policy for Wackenhut.[6] Nevertheless, for the reasons discussed below, the Wackenhut officers that stopped Plaintiff's vehicle did not violate Plaintiff's constitutional rights and, thus, there is no liability to attach to Wackenhut.

Plaintiff alleges that her vehicle was illegally seized in violation of the Fourth Amendment and that Wackenhut is responsible for the alleged illegal seizure. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Following the Supreme Court's decision in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "the law has become well-established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation," United States v. Rusher, 966 F.2d 868, 876-77 (4th Cir.1992), without running afoul of the Fourth Amendment. Such an investigative stop must be "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." U.S. v. Cortez, 449 U.S. 411, 417 (1981) (citing Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); Delaware v. Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Adams v. Williams, 407 U.S. 143, 146-149, 92 S.Ct. 1921, 1923-1924, 32 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. 1, 16-19, 88 S.Ct.1868, 1877-1879 (1968)).

Plaintiff lacks standing to assert a violation with respect to the June 23, 2004, stop. She was

---

[6] It is not clear from the record that Underwood did not have the requisite authority; thus, viewing the facts in the light most favorable to Plaintiff, an issue of fact exists. That Underwood directed his officers to stop Plaintiff indicates that he had personal involvement in the stops, but Underwood is not named as a Defendant.

not driving the vehicle nor was she a passenger in the vehicle at the time it was stopped. Her vehicle was not impounded or searched. Plaintiff suffered no injury as a result of this traffic stop, and, thus, has no standing to bring any claim with relation to this stop. See Heckler v. Mathews, 465 U.S. 728, 738, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984); Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (stating that to have standing, party must have suffered an injury in fact, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical'").

However, even if Plaintiff did have standing, the June 23, 2004, stop was legal. The stop was predicated upon two separate bases: first, Officer Gain had been instructed by his Lieutenant to stop a Chrysler Sebring because it was believed, based upon information reported to and substantiated by Underwood, that the driver of such a vehicle did not possess a valid South Carolina driver's license. An informant's tip can provide officers with articulable suspicion to stop the vehicle. United States v. Hensley, 469 U.S. 221, 226, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). The stop was based upon more than just an informant's tip, because Underwood verified the information from the tip before he directed his officers to stop Plaintiff. Second, Officer Gain noticed that one of the brake lights on the vehicle was not working. Officer Gain issued a citation for the broken brake light.

Planitiff asserts that her vehicle did not have a broken brake light. However, even assuming this to be true, the stop was lawful based on the information Officer Gain received from his Lieutenant regarding Plaintiff's lack of a valid driver's license. Plaintiff also argues that driving a governmental vehicle on the SRS without a valid license is not illegal and, therefore, Underwood had no reasonable basis for concluding and informing his officers that Plaintiff was driving under suspension since he had no information that she was driving on a state road or highway, which would have been illegal. Plaintiff provides no authority for her argument that it is not illegal to drive without a license on the

SRS.  This argument is without merit.

Finally, although Plaintiff was not driving the vehicle, it was her car which had been previously identified to Officer Gain and the stop lasted only long enough for Officer Gain to request the driver's license and vehicle registration, run a computer check, and issue the citation.  Thus, the stop was justified by an objective manifestation that Plaintiff was engaged in criminal activity, and was therefore lawful.

Plaintiff's claim based on the October 21, 2004, stop is barred by Heck v. Humphrey, 512 U.S. 477 (1994).  Although this claim survived the Rule 12(b)(6) motion, it cannot survive the summary judgment stage.  The record reveals that the October 21, 2004, stop was predicated upon the fact that, like Officer Gain, Officer Quattlebaum had been instructed by his supervisor to stop a Chrysler Sebring because it was believed that the driver thereof did not possess a valid South Carolina driver's license.[7]  The stop did not last any longer than necessary to check Plaintiff's license.  Once Officer Quattlebaum received information that Plaintiff had a valid Georgia driver's license, he released Plaintiff and she was free to leave.  Plaintiff's vehicle was not searched or impounded.

Heck held, in pertinent part, that to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must first prove that the conviction or sentence at issue has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus.  Heck, 512 U.S. at 486-487.  Any claim of illegal seizure of her person during the October 21, 2004, stop would certainly be barred by Heck because she was stopped for the

---

[7]It is undisputed that the vehicle also displayed an expired dealer's tag, which also provided Officer Quattlebaum with reasonable suspicion to stop Plaintiff's vehicle.

same reason she was convicted, that is, for driving with a suspended license. Thus, such a claim would call into question the validity of her conviction. Plaintiff's attempt to separate the seizure of her vehicle from the seizure of her person on October 21, 2004, is faulty. The record reveals that Plaintiff's vehicle was not searched or impounded or otherwise "seized" except as a necessary consequence of stopping Plaintiff because of information the Officer had received that she was driving with a suspended license. Plaintiff was convicted of driving with a suspended license. Thus, Plaintiff's claim that the stop or "seizure" of her vehicle on October 21, 2004, was illegal calls into question the validity of her conviction and is, thus, barred by Heck.

Plaintiff also claims that Wackenhut officers used excessive force when they handcuffed her and arrested her on October 25, 2004. Claims that law enforcement officers used excessive force when making an arrest "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The standard of review is an objective one, [and t]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Anderson v. Russell, 247 F.3d 125, 129 (4th Cir.2001) (citing Graham, 490 U.S. at 397, 109 S.Ct. 1865).

In the present case, the parties dispute whether any force was used at all when arresting Plaintiff. The Wackenhut officers who participated in Plaintiff's arrest do not claim that Plaintiff attempted to resist her arrest in anyway. They assert that, other than complaining that her handcuffs were too tight, which Officer Key checked and determined were not too tight, Plaintiff never complained of being in pain or of being injured in anyway. However, Plaintiff asserts that she suffered a torn ligament in her shoulder as a result of the officers twisting her arms while handcuffing her. She asserts that she required medical treatment for several weeks after the arrest and she suffered substantial physical and emotional injuries as a result of the force used by Wackenhut officials during

her arrest. However, she fails to present medical records or other evidence of medical treatment and diagnosis other than her testimony.

Nonetheless, unlike with the traffic stops, it is clear that Wackenhut lacks any responsibility for any excessive force that may have been used on Plaintiff during her arrest. Plaintiff does not name any of the individual officers involved in her arrest as Defendants  Plaintiff has not alleged that Underwood or anyone else directed the arresting officers to use certain force to arrest her. Nor has she pointed to any policy or custom that required the use of excessive force or that the Wackenhut officers so frequently used excessive force during arrests that it became custom. To the contrary, Plaintiff argues that Wackenhut's custom was to allow employees to voluntarily surrender themselves at a location off site, and that they failed to follow that custom with her. Sharon Cormier, a criminal investigator with Wackenhut and one of the arresting officers avers that she decided to arrest Plaintiff at her office because of Plaintiff's previous refusal to allow herself to be served with civil papers. There is no evidence in the record nor any allegation that anyone directed Cormier to arrest Plaintiff at her office or that Cormier was a final decisionmaker for Wackenhut. Nevertheless, even if that were so, the decision to arrest someone as opposed to allowing that person to voluntarily surrender does not equate to a decision to use force or excessive force during that arrest. Thus, assuming, <u>arguendo</u>, that excessive force was used during Plaintiff's arrest, Wackenhut cannot be liable for the actions of its officers. Therefore, summary judgment is appropriate on this claim as well.[8]

**B.    Section 1985 claims**

Plaintiff claims that Wackenhut conspired with others to deny her equal protection under the

---

[8] Plaintiff also pleads § 1988. Under 42 U.S.C. § 1988, a prevailing party is entitled to reasonable attorney's fees in a § 1983 action. Because it is recommended that summary judgment be granted on Plaintiff's § 1983 claims, attorney's fees under § 1988 are not warranted.

law. To establish a sufficient cause of action for "conspiracy to deny equal protection of the laws" under section 1985(3), a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. Buschi v. Kirven, 775 F.2d 1240, 1257 (4th Cir.1985); see also Griffin v. Breckenridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798-99, 29 L.Ed.2d 338 (1971). Further, to prove a § 1985 conspiracy, a plaintiff must show an agreement or a meeting of the minds among the defendants to violate his constitutional rights. See Simmons v. Poe, 47 F.3d 1370, 1377 (4th Cir.1995) (citing Caldeira v. County of Kauai, 866 F.2d 1175, 1181 (9th Cir.1989), cert. denied, 493 U.S. 817, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989); see also Lenard v. Argento, 699 F.2d 874, 882-83 (7th Cir.1983), cert. denied, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983) (a civil conspiracy under section 1985 is a combination of two or more persons acting in concert to commit an unlawful act, the principal element of which is an agreement or single plan between the parties to inflict a wrong against or injury upon another). "Merely conclusory allegations of conspiracy, unsupported by a factual showing of participation in a joint plan of action, are insufficient to support a section 1985(3) action against a motion for summary judgment." Id. at 1376.

     First, because Plaintiff's rights were not violated with regards to the two stops of her vehicle, any claim of conspiracy as to those two stops fails. Furthermore, just as Plaintiff fails to show that Wackenhut is liable for any excessive force that may have been used during her arrest, she likewise fails to show that Wackenhut participated in any conspiracy to use excessive force against her. Plaintiff presents no evidence of Wackenhut's participation in a joint plan of action. Finally, Plaintiff also appears to argue that she was denied equal protection of the laws during her arrest because she

was arrested at her office and all other employees were allowed to voluntarily surrender at a location other than the office. Plaintiff fails to present evidence that Wackenhut participated in a conspiracy or that there was a meeting of the minds involving Wackenhut regarding the decision to arrest her at her office. Additionally, there is no evidence that the officers that arrested her were motivated by a specific class-based, invidiously discriminatory animus in light of the fact that Plaintiff asserts that <u>all</u> other employees were allowed to self surrender, not just employees outside her protected class. In fact, the only other employee Plaintiff points to who was not allowed to self surrender is a white male. Thus, summary judgment is appropriate on Plaintiff's claims under § 1985.

## V.    CONCLUSION

In light of the above analysis, it is recommended that Wackenhut's Motion for Summary Judgment (Document # 161) be granted and Plaintiff's claims against this Defendant be dismissed.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 26, 2009
Florence, South Carolina

**The parties' attention is directed to the important notice on the attached page.**